**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CARDEA GROUP STOCKHOLDER LLC; MWH HOLDINGS ApS; ROSS BUNDY AND ANGELA SHUE 2020 REVOCABLE TRUST; SERRA CAPITAL II, L.P.; SERRA CAPITAL II FOLLOW-ON FUND, LP; SERRA CARDEA, LLC; and PAUL BUNDY,<br><br>Plaintiffs,<br><br>v.<br><br>PARAGRAF LIMITED; SIMON THOMAS; CHARLES PLATTS; JOHN TINGAY; and ANTHONY PEARCE,<br><br>Defendants. | C.A. No. _______________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Cardea Group Stockholder LLC ("CGS") and the former stockholders of Cardea Bio, Inc. named in the caption (the "Converting Holder Plaintiffs," and together with CGS, "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendants Paragraf Limited ("Paragraf"), Simon Thomas, Charles Platts, John Tingay, and Anthony Pearce, allege as follows upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. It is one thing to have revolutionary technology; it is quite another thing to have revolutionary technology that can be produced on a commercial scale. The former may yield awards and publications; only the latter can return billions of dollars to investors.

2. Cardea Bio, Inc. ("Cardea") and Paragraf were both early-stage graphene nanotechnology companies, but they were not the same kind of company. Cardea, based in San Diego, had brought a graphene biosensor product to market and held a portfolio of graphene-manufacturing patents. Paragraf, a United Kingdom company, also sold a graphene product—a magnetic-field (Hall) sensor—and held a portfolio of patents centered on a graphene production invention by Paragraf's founder and CEO, Defendant Dr. Simon Thomas. What really set Paragraf apart was its claim that it was "the first company worldwide to deliver a scalable approach to graphene electronic device manufacturing" and could fabricate the devices in-house.

3. On the strength of that scalability claim, Paragraf had raised tens of millions of dollars. In March 2023, Paragraf took its claim further, touting its "unique ability to mass produce components with graphene using industry standard semiconductor processes."

4. In April 2023, Cardea's stockholders approved a lopsided merger with Paragraf, where Cardea was valued at a fraction of Paragraf, based almost entirely on Paragraf's claim of scalable manufacturing capacity. In a consent solicitation statement approved by Paragraf (the "Stockholder Notice"), Cardea's Board told the shareholders that Paragraf had "the very specialized kind of graphene semiconductor foundry" needed to scale Cardea's chip production. The document's entire description of Paragraf's business was two sentences, and both were capability claims: Paragraf "is a manufacturer of 2D graphene chips for sensors using standard semiconductor processes," and it "offers scalable manufacturing of graphene-based electronic devices for industrial applications."

5. Paragraf's core claim was a lie. Paragraf had not even achieved *process control* over its graphene manufacturing. "Process control" is the basic, unglamorous foundation that must

exist before chips can be produced reliably, let alone at scale. Paragraf could hand-build its devices in small numbers, but it could not manufacture them at any significant commercial volume.

6. Paragraf had merely the *hope* of one day achieving mass production of graphene devices, not the reality, but it claimed the achievement anyway. The failure was Paragraf's, not graphene's: graphene-based sensing is genuine, commercially valuable technology. And it is capable of being scaled to mass production, as Cardea had developed a process for doing so that relied on an outsourced foundry, and that experience made Paragraf's claims believable. Paragraf, however, simply did not have the scalable fabrication capability it was marketing.

7. At the same time, Paragraf engaged in a pattern of active concealment designed simultaneously to embellish its claimed technological achievements and to prevent Cardea from ascertaining the truth. It invoked Cardea's own patent portfolio—claiming that letting Cardea's diligence team witness its production process would create patent-infringement exposure—as a pretext for refusing entry to the cleanroom where fabrication supposedly took place. It rented a warehouse to build a second, larger foundry—ostensibly to produce volumes of products it did not know how to produce. And Paragraf employed a large commercial team to sell products—at a scale that it could not genuinely expect to deliver. These measures served to project an image about Paragraf that concealed the truth of its technological immaturity. Thomas, in short, ran Paragraf on the principle of "fake it until you make it."

8. The truth did not surface until years later. On April 28, 2025, a Paragraf executive—its newly hired Senior Vice President of Sales—disclosed to Cardea co-founder Ross Bundy that Paragraf could not produce merely 20,000 biosensor chips in a ten-week period—a volume Cardea itself had long been able to produce, and a small fraction of the commercial scale Paragraf had publicly represented—both before and after the merger—that it had already achieved. And a

former Paragraf employee later disclosed that, long after the merger's closing, Paragraf's own head of fabrication had admitted internally that none of Paragraf's fabrication processes was under control. Thus, at the time of the merger, scalable commercial production was not just non-existent, but still years away from reality.

9. Paragraf's post-merger actions revealed Paragraf's true motive for seeking the merger: obtaining Cardea's intellectual property, by hook or by crook. It laid off most of the acquired Cardea biosensor team in the United States—the more advanced of the combined company's two biosensor efforts—within a year of closing.

10. Due to Defendants' fundamental misrepresentations about Paragraf's core capabilities, Cardea's former stockholders are now left holding Paragraf stock worth a small fraction of what they had been promised, and with serious doubts about whether Paragraf's management can ever achieve the impressive technological feats that it falsely claimed to have already achieved before the merger.

11. Plaintiffs bring this case to hold Defendants accountable for their extraordinary fraudulent scheme—including intentional misrepresentations, half-truths, and material omissions—perpetrated over years. Plaintiffs allege federal securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder: Plaintiff CGS purchased the Paragraf shares issued as merger consideration, and the Converting Holder Plaintiffs sold their Cardea shares, which were canceled and converted in a merger induced by Paragraf's misrepresentations. Plaintiffs also bring claims for common-law fraud.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over the federal securities-fraud claim under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because that claim arises under the laws of the United States.

13. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). Those claims arise from the same misrepresentations, the same transaction, and the same common nucleus of operative fact as the federal claim, and form part of the same case or controversy.

14. This Court has personal jurisdiction over Paragraf. As to the federal claim, process may be served on Paragraf wherever it may be found under the nationwide-service provision of Section 27, 15 U.S.C. § 78aa. As to all claims, Paragraf submitted to the jurisdiction of the Delaware courts in Section 9.11 of the Merger Agreement, and it purposefully directed its conduct at Delaware by acquiring a Delaware corporation through a merger governed by Delaware law and by issuing securities to CGS, a Delaware limited liability company.

15. This Court also has personal jurisdiction over Defendants Thomas, Platts, Tingay, and Pearce with respect to the federal securities-fraud claim. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, authorizes nationwide and worldwide service of process, and where service is made under Section 27, the constitutional touchstone is the defendant's contacts with the United States as a whole. Each individual Defendant has ample such contacts, having personally participated in negotiating the acquisition of a Delaware corporation headquartered in California and in making the misrepresentations at issue to Cardea and its stockholders in the United States: Thomas, Platts, Tingay, and Pearce each traveled to San Diego in the spring of 2022 and made representations there about Paragraf's capabilities; Thomas traveled to California three times during the pre-merger negotiation period for the purposes of the potential merger; and Thomas and Platts

delivered the December 14, 2022 management presentation to Cardea's U.S.-based team; Thomas displayed a purported eight-inch production wafer by videoconference into California in November 2022; and Tingay participated in the December 14 presentation by videoconference into California. Each of those contacts is not incidental to the claims: each is itself among the misrepresentations and deceptive acts alleged below. The exercise of personal jurisdiction over each individual Defendant comports with due process. This Court also has pendent personal jurisdiction over the individual Defendants as to the state-law claims, which arise from the same nucleus of operative fact as the federal claim.

16. Venue is proper under Section 27, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims occurred in connection with a merger effected under Delaware law that acquired a Delaware corporation, and because the parties contractually designated Delaware as the forum for "all actions or proceedings arising out of or relating to" the merger.

17. The securities transactions at issue were domestic. Cardea was a Delaware corporation; the Converting Holder Plaintiffs incurred irrevocable liability to surrender their Cardea shares in the United States; and CGS, a Delaware limited liability company, took title in the United States to the Paragraf shares issued as consideration. Section 10(b) and Rule 10b-5 therefore apply.

## THE PARTIES

**Plaintiffs**

18. Non-party Cardea Bio, Inc. ("Cardea") was, before the merger, a Delaware corporation with its principal place of business in San Diego, California. By the merger, Cardea became a wholly owned subsidiary of Paragraf, and it was later renamed Paragraf USA Inc.

19. Plaintiff Cardea Group Stockholder LLC ("CGS") is a Delaware limited liability company formed in connection with the merger to hold the merger consideration on behalf of the accredited former stockholders of Cardea. The formation of CGS, and the contribution of the accredited stockholders' Cardea shares to it, were required steps of the merger itself, not optional or collateral arrangements. Each Cardea shareholder's capital contribution was in the form of their shares of Cardea. At the merger's effective time, each Cardea share was canceled and, in return, CGS received the right to merger consideration, which included Paragraf stock and a right to future payment. CGS is therefore the purchaser of record of the Paragraf shares issued as consideration. Paragraf issued 822,457 shares of Acquirer Common Stock of record in CGS's name and delivered the share certificate to CGS. On information and belief, those shares were approximately 43,600 shares fewer than the 866,062 shares to which CGS was entitled under the Merger Agreement's own formula ($40,000,000 divided by the $46.13 Acquirer Stock Price, reducible only by cash paid to unaccredited investors). Plaintiffs do not assert a contract claim for that shortfall in this action, but any accounting, rescission, or damages remedy must be measured against the consideration Paragraf was obligated to deliver and itself long acknowledged, not merely the consideration it delivered.

20. The "Converting Holder Plaintiffs" are former stockholders of Cardea whose Cardea shares were canceled and converted into rights to receive merger consideration, and who bring the claims set forth below. They are:

21. Plaintiff MWH Holdings ApS is a Danish anpartsselskab—a private limited company—that held 71,945 shares of Cardea capital stock, which were converted in the merger. It is also the successor-in-interest to BlueSeq Innovations, Inc. (a former Florida corporation that had its principal place of business in La Jolla, California), which held 4,762,500 shares of Cardea

capital stock, and Allseq, Inc. (a former Delaware corporation that had its principal place of business in La Jolla, California), which held 454,806 shares of Cardea capital stock, as it was the parent company to those entities and those entities ceased operating and had all of their assets and liabilities transferred to MWH Holdings ApS. MWH Holdings ApS, like its former subsidiaries, is and was at all relevant times managed by Michael Heltzen, who made all of the pertinent investment decisions with respect to the transactions described herein while he was residing and working in California.

22. Plaintiff the Ross Bundy and Angela Shue 2020 Revocable Trust is a revocable trust established under the laws of California, acting through its trustees Ross Bundy and Angela Shue. It held 4,762,500 shares of Cardea capital stock, which were converted in the merger.

23. Plaintiffs Serra Capital II, L.P. and Serra Capital II Follow-On Fund, LP are limited partnerships organized under the laws of Delaware, and their principal place of business is in Champaign, Illinois. Together, they held 7,352,955 shares of Cardea capital stock, which were converted in the merger. The entities were both managed by Timothy Hoerr, a former Cardea director.

24. Plaintiff Serra Cardea, LLC is an Illinois limited liability company with its principal place of business in Champaign, Illinois. It held 783,411 shares of Cardea capital stock, which were converted in the merger. It is also managed by Hoerr.

25. Plaintiff Paul Bundy ("Paul Bundy") is a resident of Arizona who held 74,999 shares of Cardea capital stock—including 68,181 shares held through a self-directed individual retirement account for which IRAR Trust Co. serves as custodian and for which Paul Bundy makes all investment decisions—which were canceled and converted in the merger. Paul Bundy executed no Voting Agreement and gave no written consent.

26. Unlike the other Converting Holder Plaintiffs, Paul Bundy (and many other non-signing Converting Holders) executed no Voting Agreement, no written consent, no release, and no CGS LLC Agreement, and each was compelled into the merger, and into membership in Cardea Group Stockholder LLC, by operation of a drag-along obligation accepted upon becoming a Cardea stockholder, and none executed any instrument in connection with the merger itself. Their Cardea shares were nonetheless canceled and converted by operation of the merger and Delaware law.

**Defendants**

27. Defendant Paragraf Limited is a private limited company incorporated under the laws of England and Wales, with its principal place of business in Cambridgeshire, United Kingdom. Paragraf holds itself out as a manufacturer of graphene-based electronic devices. Paragraf was the acquirer in the merger and issued the shares that the former Cardea stockholders, through CGS, received as consideration.

28. Simon Thomas is a UK citizen and resident who has served as Paragraf's Chief Executive Officer (CEO) at all relevant times. He founded Paragraf and is the inventor on Paragraf's core patent for creating graphene.

29. Charles Platts is a UK citizen and resident who served as Paragraf's Chief Financial Officer (CFO) at all relevant times, though he is no longer employed there.

30. John Tingay is a UK citizen and resident who served as Paragraf's Chief Technology Officer (CTO) at all relevant times, though he is no longer employed there.

31. Anthony Pearce is a UK citizen and resident who served as Paragraf's Chief Operating Officer (COO) at all relevant times and continues to serve in that role. As COO, Pearce was responsible for ensuring processes were under control.

## FACTS COMMON TO ALL COUNTS

### A. Graphene and Cardea

32. Graphene is a synthetic material made of a single layer of carbon atoms—one atom thick—arranged in a honeycomb lattice. It is among the strongest and most electrically conductive materials known, and those properties make it valuable for building advanced sensors and electronic devices.

33. Realizing graphene's value at commercial scale, however, requires solving difficult manufacturing problems, such as achieving "process control," the statistical stability and repeatability that allow a process to produce devices reliably, at predictable yield, and in volume.

34. Cardea—originally incorporated in Delaware in 2014 as Nanomedical Diagnostics, Inc.—developed graphene-based biosensor chips and brought a biosensor product to market. The product could be customized to detect different biological compounds according to a customer's needs. Cardea's original co-founders included Ross Bundy, its Chief Executive Officer, and Brett Goldsmith, its Chief Technology Officer.

35. Goldsmith was the lead inventor on numerous patents held by Cardea. Some were specific to the challenges of biosensing—in particular, working with liquid substrates atop an electronic chip—while others concerned manufacturing processes that have proven essential to making graphene devices generally, not only biosensors.

36. In 2015, Cardea achieved a first-in-the-world production process for graphene-based devices. Rather than building a dedicated foundry of its own, Cardea adapted modern, commercially available semiconductor process techniques to graphene using existing commercial MEMS-style foundries—a supply-chain model that let Cardea produce chips on an as-needed basis, with capacity, if fully utilized, of upwards of 10,000 chips per week. That work generated numerous patents that became a core part of Cardea's intellectual-property portfolio. Cardea's

process, while not formally audited, was maintained to the standards of modern ISO 9001 quality control, with written, documented procedures, and Cardea produced approximately 30 batches of graphene devices in lots of roughly 1,000 to 8,000 devices each, with consistent performance.

37. Cardea commercialized that capability. In 2016, it launched the first-ever graphene biosensor product, the Agile R100, selling approximately 20 instruments, along with chips, to pharmaceutical companies and academic laboratories. In 2019, it developed the Robotic Measurement System (RMS), increasing throughput from a maximum of approximately 4 measurements per user per day on the R100 to approximately 30. And in 2021, Cardea organized a subsidiary, CRISPRQC Inc., focused on the emerging gene-editing and synthetic-biology market, whose assays measured multi-omics characteristics and biological activity at a pace of approximately 100 chips per day, five days per week.

38. In 2018, a key academic customer, Dr. Kiana Aran, published a foundational paper in Nature, a leading peer-reviewed scientific journal, demonstrating the use of Cardea-produced graphene biosensors in novel ways to enhance medical diagnostics. Dr. Aran and Michael Heltzen then formed a company, Nanosens, to commercialize that capability with the help of Cardea (then still named Nanomedical Diagnostics). Nanomedical Diagnostics had focused on protein interactions; Nanosens extended the technology into genomics. The two businesses combined, and the merged company was renamed Cardea Bio, Inc. to reflect the expanded opportunity. Through that combination, Heltzen and Dr. Aran joined the business alongside co-founders Bundy and Goldsmith, and Heltzen later became Cardea's Chief Executive Officer.

39. Much of Goldsmith's work at Cardea was focused on establishing "process control" in order to reliably produce biosensors that behaved in a predictable manner. Process control over at least one product was first achieved in February 2016: testing began in June 2015, solutions

were identified by October 2015, and the first batches of chips were completed and fully tested by February 2016, demonstrating that the process was under control and could reliably and reproducibly produce graphene devices. Consistent with standard chip production practices, and as required by Cardea's own standard operating procedures (SOPs), even an existing controlled process was reevaluated at regular intervals, typically once a year.

40. In a November 2022 update to investors, Heltzen emphasized that a "process control" improvement achieved in the prior quarter was a significant achievement in production.

41. By 2023, Cardea had moved to a partnering and licensing business model and had built a commercial pipeline of hundreds of companies that had expressed interest in its technology—over 100 of them with well-qualified applications—including seven active, paid customer projects, with counterparties ranging from smaller firms to Bayer and Siemens, along with application-development projects for the Gates Foundation.

**B. Paragraf and Its 2022 Series B Financing and Public Claims**

42. Paragraf, founded after Cardea, is a United Kingdom company focused on producing graphene-based devices, particularly graphene field-effect transistors (GFETs). Its first commercially available GFET was a graphene magnetic-field (Hall) sensor. Through at least 2024, Paragraf produced that device only in small quantities, essentially by hand, in a cleanroom in its Somersham location.

43. Since at least 2020, Paragraf has publicly claimed that it had scalable graphene production capabilities, though those claims ramped up considerably in 2022 and 2023.

44. In July 2020, Thomas published an article on Paragraf's website under his own byline ("By Simon Thomas, CEO, Paragraf"); Paragraf updated the page on April 26, 2022—weeks after the parties' first foundry discussions began—and the article remains on Paragraf's website today. Since at least April 2022, the article has told readers that, through Paragraf's "novel,

scalable process," it is "possible to produce single-atom thick layers directly onto widely-used crystalline semiconductor wafer substrates," "with the upshot that commercially viable devices incorporating graphene may be produced in volume"; that "[t]he graphene produced by this method can cover a wide area (addressing full size 8-inch wafers)"; that "reproducibility is assured, so there will be minimal variation in end product quality"; and that "the process is compatible with existing electronic device manufacturing procedures and equipment." The article thus presents material growth, device quality, and manufacturing compatibility as an *existing* capability. (https://www.paragraf.com/redefining-hall-effect-sensors-with-graphene/.)

45. In March 2022, Paragraf secured a $60 million Series B financing led by U.S.-based New Science Ventures and including a new investment by In-Q-Tel, the venture-capital firm chartered to support the U.S. intelligence community. Paragraf's press release announcing the round stated that the funding would "help the company scale the business as it continues its international growth … and expanding its manufacturing infrastructure." Paragraf described itself as "the first company worldwide to deliver a scalable approach to graphene electronic device manufacturing, by utilising its unique contamination-free technology." The release also quoted New Science Ventures' Managing Partner as validating Paragraf's claims, implicitly based on their diligence in connection with the investment: "Developing and manufacturing at scale, graphene-based sensors and electronics devices, has been a major challenge to industry. Paragraf has met that challenge and is delivering commercial products with order of magnitude improvements in product performance." (https://www.paragraf.com /paragraf-raises-60m-in-series-b-financing/).

46. On April 11, 2022, in a rebranding announcement on its website, Paragraf touted "our manufacturing processes that enable us to uniquely produce high-purity 2D graphene at scale." (https://www.paragraf.com/paragraf-leading-the-way-in-graphene-electronics/).

47. On July 19, 2022, in announcing an Innovate UK Biomedical Catalyst grant, Paragraf described its "unique manufacturing process to reproducibly produce high purity, high-quality graphene directly on a substrate with minimal contamination" and again called itself "the first company in the world to deliver a scalable approach to graphene-based electronic device manufacturing, with an unrivalled ability to harness one of the most conductive materials in the world." (https://www.paragraf.com/biomedical-catalyst-grant/).

48. In November 2022, Paragraf signed a lease for a second location, this one in Huntingdon, UK, purportedly intended to house a new, larger cleanroom that would mass produce graphene-based devices.

49. On February 21, 2023, Paragraf publicly announced that it had taken possession of the Huntingdon facility and expected to begin ramping up production in the second half of 2023:

> The new site will allow Paragraf to massively increase the size of its clean room facilities and other manufacturing areas while providing additional office space. Paragraf staff are beginning to move in during the first quarter of 2023 and production is expected to ramp up in the second half of the year. The initial expansion of staff into the Huntingdon facility will enable accelerated development of the research, development and production areas on the current Somersham site to cope with increasing customer demand as fit out of operations at the new site progresses.
>
> Paragraf's first site was opened in October 2018 and since then Paragraf has grown from 12 employees to over 110. The company's growth has been financed by over $85 million in capital raised in several venture funding rounds. The business is currently focussed on growing revenues from its graphene-based magnetic field and current sensor products.

https://www.paragraf.com/paragraf-manufacturing-expansion/.

50. On March 15, 2023, Paragraf published the following statement on its website in connection with promoting a supposedly new graphene sensor application:

> Graphene has many great properties: incredible mechanical strength, lightness, flexibility, optical transparency and conductivity (of both electricity and heat). Due to Paragraf's unique **ability to mass produce components with graphene** using industry standard semiconductor processes, we can bring these benefits at scale in many applications, including in steer-by-wire.

https://www.paragraf.com/steer-by-wire/ (emphasis added).

51. On April 26, 2023, days after the merger's closing, Paragraf again publicly proclaimed itself able "to **mass produce graphene-based electronic devices** using standard semiconductor processes…." (https://www.paragraf.com/paragraf-to-demonstrate-innovative-battery-management-solutions-at-the-battery-show-europe-in-stuttgart/ (emphasis added)).

**C. The Companies' Pre-Merger Interactions**

52. In 2019—several years before any merger discussions—Cardea notified Paragraf that Paragraf's products might infringe Cardea's intellectual property.

53. In March 2022, Cardea and Paragraf discussed the possibility of Paragraf serving as a manufacturing foundry, or "FAB," for Cardea. Paragraf's representatives in these communications included its Biosensor Business Development Director, Malcolm Stewart, its Chief Executive Officer, Simon Thomas, and John Tingay; Cardea's included Michael Heltzen, Brett Goldsmith, and others.

54. On March 25, 2022, Stewart wrote to Heltzen that Paragraf was "interested in continuing discussions around the potential for Paragraf becoming a FAB for Cardea and how we could make that work." On March 28, 2022, Stewart added that Paragraf was "keen to understand more about your thoughts on how we could be a fab/foundry for Cardea and what the business model would look like." In setting the agenda for those discussions, Heltzen wrote that Cardea wanted to hear "a bit more about how ready Paragraf is to be a service foundry for Cardea / what it will take to make it happen and at what scale we can get to together and when."

55. During the same exchange, Cardea offered to provide Paragraf with copies of certain Cardea patents, and Goldsmith prepared to forward them after obtaining copies from Cardea's intellectual-property counsel. On March 25, 2022, Stewart responded that "it would be wise if you don't forward the patents at this point, but we thank you for the offer."

56. In or about May 2022, several Paragraf representatives—including CEO Simon Thomas, CTO John Tingay, CFO Charles Platts, and COO Anthony Pearce—traveled to San Diego for a dinner with key Cardea personnel, including Goldsmith, Heltzen, Kelly Huang, and Kiana Aran. During that dinner, among other specifics discussed, Tingay stated that Paragraf had achieved process control and had just raised the money it needed to scale production further, including by building out a new facility to increase production massively beyond what its existing foundry could produce. When discussing Paragraf's work on diagnostic devices, Tingay also stated that Paragraf had already begun testing their devices with human samples and it was working.

57. At various points before the merger (and after), Paragraf personnel, including Pearce, Tingay, and Thomas, described Paragraf's technology as the more "mature" of the two companies'. Whenever Cardea personnel offered insights about production, Paragraf employees responded that they were not interested because, they said, Paragraf had already solved the production side and did not wish to take a step backward. Pearce—the Chief Operating Officer responsible for Paragraf's production processes—made the point expressly: when production came up, he assured Cardea personnel that everything on Paragraf's side was working, stating, in substance, "We know how to do all of that stuff. It's not a problem for us."

**D. Merger discussions, the December 2022 presentation, and diligence**

58. In the wake of Paragraf's scalable-manufacturing claims and its Series B raise—which appeared to validate those claims—and following the parties' earlier interactions, Cardea and Paragraf began to discuss a business combination.

59. During the summer and fall of 2022, Heltzen and Thomas had numerous Zoom calls to discuss the companies and the potential merger. During one such call in or about November 2022, Heltzen asked Thomas: How would Cardea be sure there was enough capacity via the first

foundry (for both Paragraf's Hall sensors and Cardea's biosensors, plus various research projects that would also require capacity) until the second foundry would be up and running? In response, Thomas held up to the camera what he claimed was an eight-inch graphene wafer and advised Heltzen that that was what Paragraf could produce and use in its current production.

60. On December 14, 2022, after already conducting extensive diligence on Cardea, Thomas, Platts, and Tingay delivered a presentation about Paragraf to Heltzen, Goldsmith, Hoerr, Cardea COO Kelly Huang, and Chief Business Officer Robert Lozuk. Thomas and Platts personally traveled to Cardea's offices in San Diego, while Tingay participated via Zoom.

61. During the presentation, Thomas represented that Paragraf was able to "produce graphene electronic devices at mass scale."

62. Thomas represented that Paragraf could presently produce and sell at scale: "today what we're able to offer is the production of devices at scale. And you can go now, you can go to our website and you can buy graphene-based sensors if you wish, and we can supply them to you in volume."

63. Thomas represented that Paragraf had completed new-product development and introduction processes with large corporations and that Paragraf's devices were already "baked into" aerospace, automotive, and industrial-sensing applications; that Paragraf had "hit every single objective milestone … We've never missed a single one."

64. Each of the statements set forth in the three preceding paragraphs was a representation of Paragraf's then-present capability or then-existing customer commitments—not a projection or other forward-looking statement—and each was false when made.

65. During the presentation, Paragraf's agents also presented their production and revenue expectations. Thomas stated that Paragraf expected to produce on the order of one million

graphene chips per month by the end of 2023, increasing to approximately ten million per month by the end of 2024. Paragraf presented those volumes as achievable with its existing manufacturing capability.

66. During earlier discussions, Thomas, Tingay, and Pearce explained that Paragraf's chips were small—on the order of one millimeter by one or two millimeters—so that a single standard six-inch wafer would yield between 6,000 and over 14,000 chips. Thomas showed Heltzen an eight-inch graphene wafer, which has approximately double the capacity of a six-inch wafer. These prior representations made Paragraf's projections sound particularly plausible.

67. A slide prepared and presented by Platts at the same meeting set forth projected revenue of approximately $8 million in 2023 and rising to approximately $70 million in 2024.




68. During the presentation, these amounts were expressly characterized by Thomas as being more than mere revenue projections, but rather "the commitment by customers that they

want the volume from us"—including letters of intent, and one customer reportedly said to be committed to a two-year purchase order.

69. Platts asserted that Paragraf was looking at "over a billion dollars' worth of revenues" within the next ten years and that, in connection with their Series C raise, Paragraf's outside advisors (purportedly Morgan Stanley) had indicated Paragraf would have a valuation of "plus $500 million" and potentially "significantly higher than that."

70. At the same time Thomas, Pearce, Tingay, and Platts were making these representations during the management presentation and in numerous unrecorded conversations, Paragraf prevented Cardea from verifying them. For an extended period Paragraf formally declined to permit Cardea to visit its facility, even as Paragraf's personnel repeatedly visited Cardea's.

71. In November 2022, Tingay permitted Cardea's CTO, Goldsmith, to visit while he was in the UK on other business. On November 18, 2022, Tingay led the facility tour himself: he instructed Goldsmith to conceal his identity and the purpose of his visit from other Paragraf personnel; walked Goldsmith past—but never into—the cleanroom where fabrication purportedly occurred; limited the demonstration to a single, technician-run electrical test on one machine; and, on the asserted ground that the information was "privileged," withheld the electrical-characterization data, quality-control records, and standard operating procedures that would have revealed the truth. Paragraf did not even tell its own biosensor team about the acquisition until days before closing.

72. According to the minutes of Paragraf's February 21, 2023, Board meeting, Paragraf's CEO claimed that Paragraf could deliver 200,000 chips per quarter to an electric car battery customer in Asia, and that Paragraf could still achieve revenue of £8.2 million in 2023.

These minutes were provided to Cardea's management in or about early March 2023, as further support for Paragraf's capability claims and to induce Cardea to complete the merger.

**E. The Merger Agreement**

73. On or about March 31, 2023, Cardea and Paragraf entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement"), providing for Paragraf's acquisition of Cardea through a reverse triangular merger: a Paragraf subsidiary merged with and into Cardea, with Cardea surviving as a wholly owned subsidiary of Paragraf.

74. In the negotiations, Paragraf resisted making anything approaching the number of representations and warranties that Cardea made, on the asserted ground that Paragraf was the larger, more mature company.

75. As part of the overall transaction, certain Cardea businesses and assets—including the ventures known as CancerApp and CRISPR QC—were spun off from the company being acquired.

76. To hold the Paragraf stock issued as merger consideration on behalf of the accredited Cardea stockholders, those stockholders formed and contributed their shares to CGS, which served as the intermediary stockholding vehicle. This structure was not optional: the Merger Agreement required, as part of the transaction Paragraf designed and documented, that the accredited holders contribute their Cardea shares to CGS and that the Paragraf shares and deferred consideration be issued to and held by CGS, with each such holder's entitlement satisfied indirectly through the holder's membership interest in CGS. (*See* Merger Agreement Recital J and §1.4(a)(iii) ("indirectly, through [the Holder's] membership interest in [CGS]") and CGS LLC Agreement §2.02(a).)

**F. The stockholder vote and the consideration**

77. Paragraf owned no Cardea stock, and no stockholder or group controlled Cardea, which included over 120 distinct, unrelated shareholders, and no stockholder or group of affiliated stockholders controlled more than ten percent of the equity. The merger therefore could not have been accomplished by anyone's unilateral action: under the terms of the Merger Agreement, it required the affirmative consent of Cardea's stockholders owning at least 90% of the outstanding equity. Closing the merger thus required the written consent of Cardea's stockholders, which was solicited through the document the Merger Agreement defines as the "Stockholder Notice." The document furnished to stockholders was titled the "Confidential Information Statement," and it served as, and was part of, the Stockholder Notice. The Merger Agreement gave Paragraf control over the Stockholder Notice's content. Section 5.1(c) provides that, "[p]rior to its mailing, the Stockholder Notice shall have been approved by Acquirer," and that, "following its mailing, no amendment or supplement to the Stockholder Notice shall be made by the Company without the approval of Acquirer" (Acquirer being Paragraf). Paragraf supplied and controlled the content of the Stockholder Notice concerning Paragraf.

78. Cardea's representation as to the accuracy of the Stockholder Notice extended only to information concerning Cardea, and not to information concerning Paragraf. Section 2.24 of the Merger Agreement expressly excluded from Cardea's representation "any of the information supplied or to be supplied by Acquirer for inclusion therein." The accuracy of the statements about Paragraf in the Stockholder Notice was therefore Paragraf's responsibility alone; Cardea neither represented nor warranted their truth, and Paragraf had no contractual recourse against Cardea for them.

79. The Stockholder Notice described Paragraf in the present tense. Among the Board's enumerated reasons for the merger, it stated that there was "the likelihood of a unique strategic fit,

as Paragraf has the very specialized kind of graphene semiconductor foundry that the Company needs to scale its chip production to service its customers," and it described Paragraf as "a manufacturer of 2D graphene chips … [that] offers scalable manufacturing of graphene-based electronic devices for industrial applications." Those statements were present-tense statements of fact, and they were false: Paragraf did not have a graphene semiconductor foundry capable of scalable manufacturing, and did not offer scalable manufacturing of graphene-based electronic devices.

80. The Stockholder Notice also attached, as an annex, financial statements for Paragraf: audited accounts for 2021 and an unaudited statement of profit and loss for the year ended December 31, 2022. That financial information concerning Paragraf was supplied by Paragraf—under Section 2.24 of the Merger Agreement, Cardea's accuracy representation expressly excluded information supplied by Acquirer—and Platts, as Chief Financial Officer, was responsible for Paragraf's financial statements.

81. Stockholders representing approximately 92.5% of Cardea's outstanding shares executed a Voting Agreement in connection with the merger. The holders of the remaining approximately 7.5% of Cardea's shares signed nothing: no Voting Agreement, no written consent. Their shares were canceled and converted by operation of the merger, Delaware law, and a drag-along obligation each had accepted as a Cardea stockholder, without any contemporaneous consent to the merger itself.

82. The primary consideration each stockholder received for signing the Voting Agreement and approving the merger was a pro rata interest in the Paragraf stock issued as merger consideration—stock the Stockholder Notice specifically valued at approximately $40 million in the aggregate. The stockholders' decision to give their consent and surrender their Cardea shares

thus turned directly on Paragraf's representations about the scalable-manufacturing capability that gave that stock its purported value.

**G. Post-merger events reinforced Paragraf's technological capability claims while decimating the former Cardea employees**

83. The merger closed on or about April 21, 2023, and the certificate of merger was accepted by Delaware on that date (the "Effective Time").

84. Even after the merger, Paragraf did not allow former Cardea employees—who now worked for Paragraf—into its cleanroom for fabrication. It also consistently siloed the US-based employees and prevented them from accessing information about what was happening in the UK operations.

85. Paragraf repeatedly refused to follow the protocols and procedures for production, marketing, sale, and customer support that Cardea had developed over its years of experience working with biological reagents. As a result, Paragraf failed to support existing customers adequately, much less develop new customers for biosensors. Very shortly after the merger was completed, Paragraf elected to terminate many of Cardea's customer relationships stating, among other things, that they saw the customers as being too small for Paragraf's revenue goals.

86. In October 2023, Paragraf prepared a newsletter for the former Cardea investors and sent that newsletter to Heltzen for the purpose of sending it on to the Converting Holders. That newsletter continued to claim that Paragraf had the capability to "mak[e] commercial scale graphene-based electronics…." Page 1 began:



PARAGRAF
LEADING THE WAY IN GRAPHENE ELECTRONICS

Investor News Brief Q3 2023

**Paragraf Business News**

As Paragraf continues to make rapid progress the company is now raising capital in the form of a Series C financing round. The new funds will be deployed to increase product build capacity, expand our global activities, including the new Paragraf USA site, and deliver significant revenue growth opportunities across our graphene Hall effect sensor (GHS) and biosensor product ranges. More details on the round can be obtained via investor@paragraf.com.

Recently Paragraf signed the first long-term development deal for GHS products with an Asian customer to supply volume into high-end magnetic sensor applications. Customer qualification begins in November for an existing large volume application space; with supply levels expected to build through next year and into 2025, reaching millions of units per quarter.

This deal sits on top of growing shipments of packaged sensors for emerging and established market spaces, accelerated by the successful scaling of our standard manufacturing processes. With further supply deals in the pipeline, our products are now delivering sustained market traction across industries, making commercial scale graphene-based electronics a reality for the first time ever.

*Latest SOT23 GHS is now being tested*

**Paragraf in the news**

"the next few years are about growth"—for Paragraf, and for Cambridge too

TECHBLITZ
グラフェン製で量産成功
期待の次世代電子デバイス
CEO Simon Thomas

Paragraf successfully mass-produces graphene-based electronic devices

BUSINESSWEEKLY

Paragraf Named Business Of The Year at Business Weekly awards

And on page 2, the following was in a call-out box in the upper right corner of the page:

> **Graphene: The Electronics Promise**
>
> Paragraf is the first company in the world to produce graphene-based electronic devices at scale using standard semiconductor processes.

This newsletter reinforced the pre-deal narrative.

87. On or about February 5, 2024, at a meeting at the San Diego offices, Defendants Pearce and either Platts or Tingay told employees that they were shutting down the legacy Cardea processes to focus on Paragraf's fabrication processes in the UK. This again sought to reinforce Paragraf's ongoing narrative that it had the more "mature" and scalable fabrication process.

88. Paragraf proceeded to lay off approximately half of the biosensor team in San Diego—less than ten months after the merger closed. They said they planned to keep a skeleton staff and that all significant operations were moving to Paragraf.

89. On information and belief, the skeleton staff was retained because Paragraf had a backlog of Cardea sensors already fabricated and it only needed to retain the staff necessary to make those sensors functional for customers so as to dispose of the existing inventory.

90. Goldsmith's contract with Paragraf had provided that he was supposed to run the biosensor team for the entire company and to have all the technical staff in the United States report to him. Right after the layoffs, Goldsmith sought to resign immediately—because his key responsibilities had been eliminated—and Paragraf initially indicated its intent to "cure" the change in conditions, however, it failed to do so and Goldsmith tendered his resignation "for good reason," which was accepted on May 21, 2024. As a condition of receiving severance, he was required to sign a general release and a renewed non-disclosure agreement.

91. Paragraf's performance after the merger bore no resemblance to what Thomas and Platts had projected. In fact, Paragraf's 2023 sales revenue, including from Cardea's customers, was only about $1 million, and its 2024 sales revenue fell to approximately $400,000—less than Cardea alone had generated in 2022, and less than 1% of what Thomas and Platts had projected.

92. The revenue decline in 2024 was due in substantial part to Paragraf's refusal to continue servicing legacy Cardea customers, including after it closed the San Diego office.

**H. Discovery of the Fraud**

93. On April 28, 2025, at an industry conference, Paragraf's new Senior Vice President of Sales, Rupert Prince—who had joined Paragraf in January 2025—told Cardea co-founder Ross Bundy—who by then was the chief executive of a Paragraf customer—that Paragraf could not

produce even 20,000 chips in a ten-week period. That capacity was far below what Cardea had been able to produce for years, and even farther below the commercial scale Paragraf's own CEO had represented that Paragraf had already achieved before the merger.

94. That disclosure prompted Bundy and Heltzen to investigate the production bottleneck more closely. Through that investigation, they learned that Paragraf's problems were not unanticipated post-merger setbacks: Paragraf had never possessed the scalable graphene-device manufacturing capability it had claimed. It did not have a viable production foundry in its cleanroom; it remained, in substance, an early-stage research-and-development operation.

95. Paragraf had the ability to produce graphene devices, but only at a low yield—nowhere near approaching "at scale" let alone "mass scale" as represented—and with very high error rates.

96. None of the managers of CGS, nor any appointed agents of CGS (as there were none), had any knowledge of Paragraf's true production capabilities before April 2025.

97. The investigation revealed that, at a post-closing meeting in September 2023, Paragraf's head of fabrication, Andy Pegram, admitted that none of Paragraf's fabrication processes were under control and that the company needed to begin bringing them under control. Goldsmith, then still employed by Paragraf, was present and heard that admission. He was, however, bound by confidentiality obligations—including post-employment obligations imposed as conditions of his separation and severance agreements—that prevented him from disclosing what he had just learned.

98. The investigation also revealed that the unaudited 2022 profit-and-loss statement furnished with the Stockholder Notice had been materially misleading. Paragraf's audited accounts for the same year—filed only after the merger closed—reported revenue of approximately

£228,923, of which only approximately £83,320 was product sales, and a gross loss, with cost of sales exceeding revenue. On information and belief, the revenue reported in the unaudited statement included substantial grant and other non-product income, which the statement did not disclose.

99. Plaintiffs do not presently contend that any particular line item of the unaudited statement has been shown to be false, because the accounting judgments behind those figures are currently known only to Paragraf. Even so, the unaudited statement conveyed to Cardea's stockholders the impression of a business already generating meaningful product revenue at a healthy margin, while omitting the facts necessary to make that impression not misleading, including the composition of the reported revenue. That impression was at odds with the audited results for the very same year and with the hand-built, high-error-rate reality of Paragraf's production, and it reinforced the false picture of scalable, profitable manufacturing conveyed by Paragraf's capability representations.

100. Paragraf's own subsequent publications about its wafer platform confirm both that the production capacity it represented to Cardea did not exist and that Paragraf knew it. As discussed above, Thomas had answered Heltzen's direct question about near-term capacity by displaying an eight-inch wafer as what Paragraf could produce and use, and the volumes presented in December 2022 were apparently premised on that platform. Paragraf's later statements admitted the truth in stages.

101. The wafer-size deception unraveled in stages, in Paragraf's own words. First, an August 28, 2024 EE Times article, based on an interview of a Paragraf executive, described Paragraf's Somersham site—in passing, without noting the significance—as its "two-inch wafer substrate production facility," and reported that Paragraf's six-inch fabrication facility was "soon

to be opened," with scale-up planned for 2025. (https://www.eetimes.com/paragraf-looks-toward-scaling-up-production-of-graphene-devices/.)

102. Then, in an October 23, 2024 press release announcing an Innovate UK grant, Paragraf admitted that its "proprietary graphene deposition process was originally developed using substrate wafers of varying materials, and research scale, primarily 2" wafer sizes"—wafers "capable of producing up to 1,500 graphene Hall sensor devices, or 64 larger graphene molecular sensors, per wafer." Six-inch wafers were described as being in "pilot tests"; the grant itself, won in early 2024, was "for the purpose of supporting the scale up of manufacturing of six-inch device wafers from research to production quantities"; and larger substrates remained "in the future." (https://www.paragraf.com/press-release-paragraf-awarded-innovate-uk-grant/.)

103. None of the Converting Holders, including the CGS Managers, was aware of these wafer-size publications until after the aforementioned April 28, 2025 discovery.

104. Finally, on December 22, 2025, Paragraf announced that it had "successfully produced the first 6-inch wafer" at Huntingdon, stating flatly: "Until now, Paragraf has produced GFETs on 2-inch sapphire wafers." Thomas was quoted celebrating that this single wafer "demonstrates ... our ability to scale," and the release described the Huntingdon facility as supporting "the transition of graphene electronics from laboratory-scale innovation to commercial-scale production." (https://www.paragraf.com/6-inch-graphene-wafer/.)

105. The October 2024 and December 2025 statements cannot both be accurate: either the claimed six-inch "pilot tests" of 2024 overstated what then existed, or the December 2025 "first" overstated the achievement. Both, however, are Paragraf's own statements, and on either reading Paragraf's device production remained at research scale, primarily on two-inch wafers, from before the merger until at least late 2024. Measured against those admissions, the article

described in paragraph 44 above and the eight-inch wafer Thomas displayed to Heltzen in November 2022 were false when made: a company whose declared production platform had not advanced beyond two-inch wafers did not have "assured" reproducibility "addressing full size 8-inch wafers," did not have mass-scale production "today" in December 2022, and could not have believed the volumes it projected—which, at Paragraf's own published per-wafer yields, would have required thousands of flawless wafers per month from a hand-run, research-scale line.

**I. Paragraf's knowledge of falsity**

106. Paragraf knew, through Thomas, Platts, Tingay, Pearce, and its other senior officers, that its representations of present capability and customer commitments were false when it made them. Pearce in particular, as the Chief Operating Officer responsible for implementing process controls, knew that Paragraf had not achieved them.

107. Based on the true state of Paragraf's production technology—its technological immaturity and its lack of process control—the production and revenue figures Paragraf presented to Cardea's management, including the volumes stated in the December 2022 presentation and the claim in the February 21, 2023 board minutes that Paragraf could deliver 200,000 chips per quarter to an automotive-battery customer in 2023, were stated in bad faith, knowingly false, and lacked any reasonable basis when made. Paragraf was technologically incapable of delivering anything close to that volume of chips, and the customer ultimately terminated its contract with Paragraf on those very grounds.

108. Defendants engaged in a multifaceted scheme to deceive Cardea into the merger, including acknowledging the likelihood of Paragraf infringing Cardea's patents; prematurely leasing the new Huntingdon location; feeding impossible revenue projections to its investment bankers and Cardea shareholders; stage-managing the sole diligence visit while withholding the quality-control records that would have revealed the truth; publicly announcing a mass-production

facility whose production Defendants knew could not "ramp up" as announced; and fielding a commercial sales organization to sell volumes Paragraf could not produce. Each of these acts was deceptive in itself, independent of any statement, and each was undertaken to create and maintain the false appearance of an operating, scaling graphene manufacturer. The Huntingdon lease is illustrative: Paragraf signed it in November 2022—years before Paragraf had any process-control basis to use such a facility—and announced possession of the site five weeks before the Merger Agreement was signed, timing keyed to the merger and financing narrative rather than to production Paragraf was capable of performing. The facility's production did not "ramp up in the second half of" 2023 as announced; more than a year after the merger, Paragraf's six-inch fabrication facility there was still described as "soon to be opened," and Thomas would later describe the foundry as having opened only in 2025.

109. Paragraf's concealment continued after closing. For example, in October 2023, Paragraf's newsletter to the former Cardea investors attributed its production delays to bureaucratic obstacles in opening its new foundry location, while omitting that Paragraf was operating out of a research facility using research processes rather than commercial production processes, and that none of its fabrication processes were under control.

110. As evidence that Paragraf knew it had been falsely presenting itself as having mature and scalable graphene device manufacturing capabilities, Paragraf issued a press release on June 29, 2026, on its website, in which it attempted to rewrite the narrative by claiming that: (i) Paragraf was only then "developing maturity from startup to full-scale semiconductor manufacturing company"; (ii) a newly announced committee would support the company "as the company scales production" and "works towards" full integration; and (iii) "having built the world's first graphene electronics foundry, we are now cementing our position." Each statement

admits that the at-scale manufacturing capability Paragraf represented as already existing in 2022 was, on Paragraf's own telling, still being built in 2026.

**J. Reliance**

111. In approving the merger, Cardea and its Board relied primarily on Paragraf's longstanding claim to have a functional foundry and technology that could reliably produce graphene-based devices at commercial scale.

112. Despite that actual reliance, of which Paragraf's management was well aware, Paragraf insisted that Cardea's management disclaim "the Company's" reliance outside of the barebones representations and warranties in the Merger Agreement. Nonetheless, the Merger Agreement did *not* purport to disclaim reliance by the Converting Holders, whose approval was known to be required.

113. The Merger Agreement contained no express representation addressed to Paragraf's manufacturing capability, even though that capability was explicitly the main upside of the merger for Cardea and its investors, and what induced them to enter into the transaction. The absence of such a representation is not a negotiated risk allocation. Rather, its absence reflects the foundational character of the fraud at issue in this suit: a company that is incapable of carrying out the line of business that it purports to be in. Scalable graphene manufacturing was Paragraf's publicly proclaimed corporate identity—the premise on which the entire transaction was built—not a negotiable deal term. Indeed, while Paragraf generally resisted providing reciprocal representations and warranties, Cardea did not even request a manufacturing capacity representation. Just as an acquirer of The Coca-Cola Company would not think to demand a representation that Coca-Cola sells soft drinks, Cardea did not think to demand a representation that Paragraf could do the one thing Paragraf told the world only it could do. Nor could it reasonably be expected to have done so. Paragraf thereby kept its single most important factual

claim outside the contract, while continuing to assert it as accomplished fact in the Stockholder Notice, in public statements, and in direct communications.

114. Defendants' repeated pre-merger assertions that Paragraf was more "mature" were also false. Its technology was actually less mature than Cardea's in terms of product reliability, adoption and use by customers, and production methods. Thus, Paragraf's false assertion of superior maturity induced Cardea's consent to Paragraf making significantly more limited representations and warranties than Cardea provided.

115. Paragraf knew that Cardea's management, including Heltzen, relied on this most fundamental factual claim by Paragraf because Paragraf itself published that reliance. In addition to approving the statements to the Converting Holders directly, Paragraf's press release announcing the merger stated:

> "Joining Paragraf allows us to use the world's only mass-produced, transfer-free monolayer graphene to manufacture the state-of-the art graphene-based biosensors developed by the Cardea team over the last ten years. We are looking forward to unlocking powerful synergistic effects to advance the broad and growing use of graphene biosensors for the benefit of both people and the planet" said Michael Heltzen, EVP of Strategy at Paragraf USA (former CEO and co-founder of Cardea Bio).

https://www.paragraf.com/paragraf-acquires-cardea-bio-to-extend-graphene-electronics-industry-leadership/

116. In the same press release, Paragraf repeated its claims of having an existing scalable manufacturing process. It began:

> Paragraf, the only company in the world to mass produce graphene electronics using transfer-free graphene and standard semiconductor processes, has acquired Cardea Bio, the world's leading producer of graphene-based biocompatible chips.
>
> And then it continued:
>
> "The world-leading IP and expertise in graphene-electronic-based molecular detection using CRISPR and other bioassay methods from Cardea Bio, combined with Paragraf's ground-breaking developments in scalable graphene production processes will deliver a

> strong pipeline of biosensing products aimed at solving major global challenges," said Simon Thomas.

*Id*.

117. The Converting Holder Plaintiffs who consented to the merger relied on Paragraf's representations of present capability in consenting to the merger and surrendering their Cardea shares. The merger could not close without the stockholders' written consent, which was solicited through the Stockholder Notice that presented Paragraf's capabilities as accomplished fact. When the Converting Holders executed the Voting Agreements and delivered their consents, they had no knowledge of Paragraf's true production capability, which Paragraf was actively concealing. But for Paragraf's misrepresentations, the Converting Holders would not have executed the Voting Agreements, delivered their written consents, or surrendered their Cardea shares.

118. In addition, certain Converting Holders—including MWH Holdings/BlueSeq, the Bundy Trust, and the Serra Capital funds, whose managers attended meetings directly with Paragraf management—relied on the statements of Thomas, Pearce, and Tingay about Paragraf's present capabilities that were made directly to them. These same Plaintiffs also relied on the projections by Thomas and Platts of future revenue and chip sales as having been asserted in good faith and with a reasonable or at least rational basis for Defendants to believe that projections might be achievable.

119. The Converting Holders who declined to execute the Voting Agreement or to consent to the merger also declined to exercise any appraisal rights in reliance on Cardea's Board's recommendation for the merger and the statements about Paragraf's present capabilities contained in the Stockholder Notice. Because their shares would be converted regardless of their individual assent, appraisal under 8 *Del. C.* § 262 was these holders' remedy under state law, and the Stockholder Notice served as the statutory notice of those rights; in reliance on that same

document, they refrained from demanding appraisal and permitted the statutory period to lapse. Had Paragraf disclosed the truth to them, these Plaintiffs could have sought to enjoin the merger under Delaware law and, on the facts alleged here, would have had a reasonable probability of succeeding; Paragraf's concealment deprived them of the information they needed to pursue that remedy and ensure that all stockholders were fully informed.

120. CGS relied on the same representations. Before the merger, the accredited former Cardea stockholders contributed their Cardea shares to CGS in exchange for membership interests in CGS. The contribution vested beneficial ownership of those Cardea shares in CGS effective immediately prior to the Effective Time, while the contributing stockholders remained the holders of record. By operation of the merger, those Cardea shares were converted into, and exchanged for, the Paragraf shares issued as merger consideration. That conversion was the operative exchange, and CGS—acting through those who caused it to accept and hold the Paragraf shares—acquired the Paragraf shares in reliance on Paragraf's representations of present capability.

121. Plaintiffs' reliance was reasonable. Paragraf supported its maturity and present capability claims with concrete, plausible detail—including its small chip size and resulting wafer yields—and it actively concealed the facts that would have exposed the claim as false, denying Cardea access to its cleanroom and withholding the technical and quality records that would have revealed the truth. A counterparty cannot be charged with discovering what the other side deliberately hid.

122. Paragraf is estopped from denying that Plaintiffs justifiably relied on its representations of present capability. Paragraf supplied the content concerning itself in the Stockholder Notice, approved that document, and knew it would be furnished to Cardea's stockholders for the specific purpose of obtaining the written consent on which the merger

depended. Having deployed those representations to secure the stockholders' consent, Paragraf cannot now deny that the stockholders relied on them.

**K. Timeliness**

123. Plaintiffs did not discover, and could not reasonably have discovered through the exercise of reasonable diligence, that Paragraf's capability representations were knowingly false when made before, and no earlier than, April 2025; the Converting Holder Plaintiffs who are not managers of Cardea Group Stockholder LLC did not learn the facts establishing the fraud until those facts were conveyed to them at various times thereafter. Paragraf's active concealment—including the blocked cleanroom access during diligence and the confidentiality and severance obligations binding the insiders who eventually learned the truth—prevented earlier discovery through lawful and available means. Paragraf bound its former-Cardea employees such as Goldsmith to silence through separation agreements that included express requirements to maintain confidentiality post-termination of employment. This action is timely, and any limitations period is tolled by Paragraf's fraudulent concealment.

124. Plaintiffs did not discover, and could not reasonably have discovered through the exercise of reasonable diligence, that Paragraf had omitted to disclose the material fact that it lacked process control before approximately March 2026, when Goldsmith, through his counsel, disclosed what he learned at Paragraf to the CGS Managers.

**L. Harm**

125. Plaintiffs were harmed by Paragraf's fraud. Had Paragraf disclosed its true capabilities, the Converting Holder Plaintiffs would not have executed the Voting Agreements and surrendered their Cardea shares, and CGS would not have acquired and held the Paragraf shares, or would have done so only on materially different terms. The Paragraf stock issued as consideration was worth only a small fraction of the $40 million valuation assigned to it in the

Stockholder Notice, and far less than the value of the Cardea interests surrendered. Plaintiffs' loss is a single economic injury, recoverable once (either to CGS or the Converting Holder Plaintiffs), whether measured by the diminution in value of the consideration or by rescission.

**M. Intimidation Efforts Confirmed the Misrepresentations and Intent**

126. On June 29, 2026, Thomas sent a letter directly to the Converting Holders—including both (i) those who signed the voting agreement and consented to the merger and (ii) those who did not—by email. The letter purported to be on behalf of Paragraf's Board of Directors and was sent with the purpose of intimidating Converting Holders so that they would not seek legal recourse through litigation.

127. This letter was the first time that anyone on behalf of Paragraf or its board directly communicated with the Converting Holders as a group. Previous newsletters had been sent directly to a CGS manager, and that manager then forwarded them on to the LLC's members. In post-merger financings, Paragraf raised funds on the representation that the Cardea merger resulted in a singular new shareholder: CGS, not over 120 separate shareholders.

128. In the letter, Thomas threatened to sue every Converting Holder who signed the Voting Agreement, regardless of whether they themselves asserted any claims at all. Moreover, the letter misleadingly failed to disclose that liability could only be premised on a Holder bringing, participating in, or voluntarily aiding a proceeding that challenges the validity of, or seeks to rescind or enjoin, the merger—not on the mere assertion of claims by others, and not on a Holder's passive receipt of any benefit from such claims. In the same letter, Thomas linked Paragraf's payment of the deferred merger consideration to the absence of claims against Paragraf, and simultaneously solicited the former Cardea stockholders to invest in Paragraf's then-open financing round—pairing the threat and the inducement in a single communication.

129. By letter dated July 1, 2026, counsel for CGS and certain Converting Holders objected to the communication on multiple grounds, and demanded a retraction, at a minimum, of the threat to sue Converting Holders who were merely passive observers or beneficiaries of potential CGS action rather than direct participants in any lawsuits.

130. On July 4, 2026, counsel for Paragraf refused to retract the letter and defended its sending on the ground that the Converting Holders are themselves true purchasers of Paragraf stock for purposes of the federal securities laws.

131. Thus, Paragraf appears to be laying the foundation to argue that CGS is not a proper Rule 10b-5 plaintiff by suddenly acting as if the holding company Paragraf itself required, papered, and recognized as its shareholder for three years does not exist—while simultaneously intimidating the Converting Holders out of suing directly. Paragraf's aim is to thin the field of plaintiffs from both directions. That double game is itself evidence of scienter: it shows Thomas's willingness to say whatever serves Paragraf's interests at the moment, without regard to consistency or truth.

## COUNT I

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (Against All Defendants)

132. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

133. This claim is brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, in connection with the merger that exchanged the Cardea stock held by the Converting Holder Plaintiffs and CGS for Paragraf securities.

134. Plaintiffs have standing as purchasers and sellers.

a. CGS is the purchaser of the Paragraf securities issued as partial merger consideration. CGS alone executed a Deed of Adherence to Paragraf's Subscription and Shareholders Agreement. And at all times after the merger until June 2026, Paragraf recognized CGS as its shareholder, not the Converting Holders. CGS's purchaser status is established by Paragraf's own closing papers and by the merger's own architecture, which Paragraf required: Paragraf issued the Paragraf shares of record in CGS's name and delivered the share certificate to CGS; CGS is the payee of the deferred-consideration note; and CGS gave value, its members having contributed their Cardea shares to it as capital contributions under its limited liability company agreement.

b. The Converting Holder Plaintiffs are sellers of their Cardea stock. Each remained the holder of record of its Cardea shares through the Effective Time; those shares were canceled and converted by operation of the merger; and the resulting entitlement to the merger consideration was satisfied indirectly, through membership interests in CGS or as otherwise provided by the Merger Agreement's payment mechanics. A merger in which a stockholder's shares are converted is a purchase or sale of a security for purposes of Section 10(b) and Rule 10b-5.

135. In connection with those transactions, Defendants made untrue statements of material fact and omitted material facts necessary to make their statements not misleading—including that Paragraf was the only company able to produce graphene electronic devices at mass scale, that it could presently supply its devices in volume, that its products were already integrated into customers' applications, that it held binding customer commitments, and that it possessed and offered a graphene semiconductor foundry capable of scalable manufacturing. Each statement

concerned Paragraf's present capability and was false when made. Each Defendant's specific statements, deceptive acts, and scienter are alleged individually below.

136. Paragraf's liability does not rest on affirmative misstatements alone. Plaintiffs proceed under each subsection of Rule 10b-5:

a. Misstatements (Rule 10b-5(b)). The present-tense representations described above—mass-scale production capability, the present ability to supply devices in volume, completed integrations into customer applications, binding customer commitments, milestones never missed, and the Stockholder Notice's statements that Paragraf "has" the specialized foundry and "offers" scalable manufacturing—were outright false statements of existing fact.

b. Half-truths (Rule 10b-5(b)). At minimum, Paragraf's statements touting its "scalable approach," its "unique ability to mass produce components with graphene," and its foundry were materially misleading half-truths: Paragraf omitted that its devices were built largely by hand at high error rates, that none of its fabrication processes were under statistical control, and that its represented revenue was not supported by binding customer commitments. Having chosen to speak about its manufacturing capability, Paragraf was obligated to disclose the facts necessary to make what it said not misleading.

c. Omissions (Rule 10b-5(b)). Independent of any affirmative statement, Paragraf omitted to disclose that it lacked process control and could not manufacture graphene devices in commercial volume—material facts uniquely within Paragraf's knowledge, which it was bound to disclose by reason of its prior statements on the same subjects, its contractual control over the content of the Stockholder Notice

concerning itself, and its active concealment of the true state of its operations. For claims premised primarily on these omissions, reliance is presumed as to all Converting Holders.

d. Scheme liability (Rule 10b-5(a) and (c)). Paragraf's deceptive conduct went beyond words: it stage-managed the sole diligence visit, directed Cardea's Chief Technology Officer to conceal his identity, withheld electrical-characterization data, quality-control records, and standard operating procedures on the false assertion of "privilege," kept its own biosensor team uninformed until days before closing, and bound knowledgeable employees to post-employment confidentiality. That conduct constituted a device, scheme, and artifice to defraud and a course of business that operated as a fraud and deceit on the sellers of Cardea stock, actionable independently of any misstatement. So too the premature Huntingdon lease: signed in November 2022 and publicized as proof of imminent mass production, it was capital deployed to manufacture an appearance, not to serve production Paragraf knew it could not perform. The public acts (the facility announcement; the commercial organization) were expressly attributed to Paragraf, and the private acts (the stage-managed visit; the withheld records) were aimed directly at Cardea; Plaintiffs actually and justifiably relied on the false appearance those acts created.

137. These theories reach every Converting Holder, signer and non-signer alike. The Stockholder Notice was furnished to all of Cardea's stockholders. Holders who executed no Voting Agreement and gave no written consent—including Paul Bundy—had their shares canceled and converted by operation of the merger and the drag-along mechanism, without any individual act

of assent; as forced sellers, their claims do not turn on individualized proof of reliance, and in all events reliance on the omissions alleged above is presumed.

138. Each Defendant played the following specific role in the misstatements and deceptive acts alleged above, and each acted with scienter:

139. **Thomas**. Thomas personally made the December 14, 2022 present-tense misrepresentations quoted above—that Paragraf "can produce graphene electronic devices at mass scale," that "today" Paragraf could supply devices "in volume," and that Paragraf had "hit every single objective milestone"—speaking in person, in San Diego, to Cardea's senior management. Thomas was also the maker, as the person with ultimate authority over their content, of the Paragraf public statements quoted above in which he is named or quoted, including the February 21, 2023 facility announcement and the Series B financing and Innovate UK grant releases. Thomas knew these statements were false when made: he founded Paragraf and invented its core process; he ran the company that was hand-building its devices at high error rates; he directed and participated in the concealment alleged above; and Paragraf's September 2023 internal admission and its 2026 public statements confirm what he knew throughout.

140. **Platts**. Platts, Paragraf's Chief Financial Officer, prepared and personally presented the December 14, 2022 revenue slide projecting approximately $8 million of 2023 revenue rising to approximately $70 million in 2024, and made the accompanying representations concerning Paragraf's claimed "$500 million plus" valuation. As CFO, Platts had ultimate authority over Paragraf's financial statements, including the unaudited 2022 profit-and-loss statement furnished to Cardea's stockholders with the Stockholder Notice. Platts knew Paragraf's actual revenue, costs, and production economics, and therefore knew that the figures and margins he presented did not reflect them.

141. **Tingay**. At the May 2022 San Diego dinner, Tingay stated that Paragraf had achieved process control and had just raised the money needed to scale production further. He also claimed that Paragraf's diagnostic devices had successfully worked on human samples—another claim that was discovered post-merger to be false. In November 2022, Tingay stage-managed Goldsmith's diligence visit: he led the tour, instructed Goldsmith to conceal his identity and purpose, kept him out of the cleanroom, limited the demonstration to a single technician-run electrical test, and withheld the electrical-characterization data, quality-control records, and standard operating procedures on the false ground that they were "privileged." Tingay, Paragraf's Chief Technology Officer, knew Paragraf lacked process control—the core fact he misrepresented at the dinner and concealed during the visit.

142. **Pearce**. Pearce, the Chief Operating Officer responsible for Paragraf's fabrication operations and for implementing process controls, personally assured Cardea personnel that Paragraf's production was solved: "We know how to do all of that stuff. It's not a problem for us." Because implementing process control was Pearce's own responsibility, he knew Paragraf had not achieved it. Pearce also carried out the deceptive conduct described above—maintaining the false appearance of an operating, scaling manufacturer whose fabrication operations he controlled.

143. **Paragraf**. Paragraf is liable for its own statements—the content concerning itself that it supplied for, controlled, and approved in the Stockholder Notice, and the press releases and website statements quoted above—and for the conduct and scienter of Thomas, Platts, Tingay, and Pearce, each of whom acted within the scope of his authority as a senior officer, which are imputed to Paragraf under settled agency principles.

144. The misrepresentations, half-truths, and omissions were material. A reasonable investor deciding whether to exchange shares in a commercialized biosensor company for Paragraf

stock would have considered it important to know that Paragraf could not manufacture graphene devices at commercial scale, had not achieved process control, and held no binding customer commitments. The omitted facts were material for the same reason: a reasonable investor would have viewed the concealed truth—that Paragraf lacked process control and was hand-building devices at research scale on two-inch wafers—as significantly altering the total mix of information available.

145. Each Defendant acted with scienter, as alleged above. Paragraf's scienter is that of its senior officers, imputed under agency principles; Paragraf knew its capability representations were false when made—as confirmed by its internal records, by the same misrepresentations it made to its own investors, and by its active concealment of its true operational state—and it made the misrepresentations intending to induce reliance and to obtain the consent necessary to close the merger.

146. Plaintiffs justifiably relied on Defendants' misrepresentations—the Converting Holder Plaintiffs in consenting to the merger and surrendering their Cardea stock, and CGS, through its managers and the contributing former stockholders, in acquiring and holding the Paragraf shares.

147. Paragraf's misrepresentations caused Plaintiffs' loss. The consideration was worth materially less than represented and materially less than the value of the Cardea interests surrendered, and its true value became apparent only as the concealed truth about Paragraf's capabilities emerged.

148. Based on a fair valuation of Paragraf's actual technology's value given the serious undisclosed barriers to making it scalable, the lack of real commercial opportunities at the time, a massive monthly cash burn to sustain the façade of having a mass-produceable product, plus

Paragraf's assets and liabilities as of a few months before the merger according to its 2022 audited financial statement, the Paragraf stock purchased by Plaintiffs was worth only approximately $7.3 million, or $32.7 million less than represented and agreed in the Merger Agreement and related documents.

149. By reason of the foregoing, each Defendant—Paragraf, Thomas, Platts, Tingay, and Pearce—violated Section 10(b) and Rule 10b-5. Plaintiffs are entitled to damages, or to rescission or rescissory damages, in an amount to be determined at trial, together with interest and costs. Because Plaintiffs' loss is a single economic injury, Plaintiffs do not seek a double recovery, and the relief sought here and under Count II is sought in the alternative.

**COUNT II**

**Common-Law Fraud (Against All Defendants)**

150. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

151. This claim is brought under the common law and arises from Defendants' intentional misrepresentations of present capability—made outside the four corners of the Merger Agreement and relied upon by Plaintiffs in consummating the merger and surrendering their Cardea shares.

152. Common-law fraud (or deceit) requires a false representation of fact; the defendant's knowledge or belief that it was false, or reckless indifference to its truth; an intent to induce action or inaction; justifiable reliance; and resulting damage. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638, 909 P.2d 981 (1996).

153. Defendants made false representations of present, existing fact, including that Paragraf was capable of producing graphene electronic devices at mass scale; that it could

presently supply its devices in volume; that its products were already integrated into aerospace, automotive, and industrial-sensing applications; that its reported revenue reflected binding customer commitments; and—in the Stockholder Notice furnished for the stockholders' consent—that it possessed the specialized graphene semiconductor foundry needed to scale chip production and offered scalable manufacturing of graphene-based electronic devices. Each was a statement of then-present capability, and each was false when made. Each individual Defendant personally made the false representations attributed to him above: Thomas and Platts in the December 14, 2022 presentation; Tingay at the May 2022 dinner and in the November 2022 visit; and Pearce in his assurances that Paragraf's production was solved. Paragraf made the representations contained in the Stockholder Notice content it supplied, controlled, and approved, and in its press releases, and is responsible for its officers' representations made within the scope of their authority.

154. Each Defendant knew the representations that they made were false, for the reasons alleged above, and made them for the purpose of inducing Cardea's stockholders to give the consent on which the closing depended.

155. Paragraf knew that Cardea's Board of Directors had approved the merger in reliance on Paragraf's claimed possession of a foundry that could produce graphene devices at scale, because the Stockholder Notice (which Paragraf approved being sent to the Converting Holders) expressly stated so, notwithstanding the fact that as to any other facts about Paragraf, the Company had purported to disclaim reliance within Section 5.19 of the Merger Agreement:

> In making its decision to enter into the Merger Agreement and recommend approval of the Merger, the Board reviewed the terms of the Merger Agreement and considered many factors including: … the likelihood of a unique strategic fit, as Paragraf has the very specialized kind of graphene

semiconductor foundry that the Company needs to scale its chip production to service its customers;

156. Plaintiffs justifiably relied on Defendants' representations of present capability in consummating the merger and surrendering their Cardea shares, and were damaged as a direct and proximate result. Thomas, Platts, Tingay, and Pearce are each personally liable for his own fraud; Paragraf is liable for its own representations and, jointly and severally, for those of its officers.

## COUNT III

### Violation of Section 20(a) of the Securities Exchange Act of 1934 (Against Defendants Thomas, Platts, and Pearce)

157. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

158. As alleged in Count I, Paragraf violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in connection with the merger.

159. At all relevant times, Thomas was Paragraf's founder, Chief Executive Officer, and a director. He possessed, and exercised, the power to direct and control Paragraf's management and policies and the specific conduct giving rise to Count I: he delivered the December 14, 2022 management presentation, made and approved Paragraf's public statements concerning its manufacturing capability, and controlled the content concerning Paragraf that Paragraf supplied for, and approved in, the Stockholder Notice.

160. At all relevant times, Platts was Paragraf's Chief Financial Officer. He possessed, and exercised, control over Paragraf's financial statements and financial representations, including the revenue and valuation representations made in the December 14, 2022 presentation and the unaudited 2022 statement of profit and loss furnished to Cardea's stockholders with the Stockholder Notice.

161. At all relevant times, Pearce was Paragraf's Chief Operating Officer, responsible for production, fabrication, and the implementation of process controls; Paragraf's head of fabrication reported up through him. Pearce possessed, and exercised, the power to direct and control the manufacturing operations whose true condition the misrepresentations concealed, and the content of Paragraf's representations about those operations. Pearce remains at Paragraf today.

162. Thomas, Platts, and Pearce were each culpable participants in the violations alleged in Count I. Each personally made, approved, or controlled the false statements or deceptive conduct at issue, with knowledge of their falsity or reckless disregard of their truth, and none of them acted in good faith.

163. By reason of the foregoing, Thomas, Platts, and Pearce are each liable under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), jointly and severally with, and to the same extent as, Paragraf on Count I.

**PRAYER FOR RELIEF**

164. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. Rescission of the acquisition of the Paragraf shares and of the transfer of the Cardea intellectual property to Paragraf, with restoration of the parties to their pre-transaction positions; Plaintiffs stand ready, and hereby offer, to restore to Paragraf upon entry of a decree of rescission all consideration received in connection with the merger (including the Paragraf shares and the deferred cash consideration, or their value);

b. Rescinding the transfer of the Cardea intellectual property to Paragraf, declaring it void ab initio upon entry of the decree, and imposing a constructive trust on that

intellectual property and its identifiable proceeds in favor of Plaintiffs or their designee, relating back to the date Paragraf acquired the property by fraud;

c. Directing Paragraf to convey and assign to Plaintiffs (or a successor entity designated by Plaintiffs) all of the Cardea intellectual property and related assets and rights, together with an express assignment of the right to sue for, and to recover all damages and profits for, infringement or misappropriation occurring during the period of Paragraf's ownership, and to execute all instruments necessary to effectuate the conveyance; and, only if necessary and feasible, reviving the separate corporate existence of Cardea Bio, Inc.;

d. An equitable accounting of all profits, revenues, and benefits Paragraf derived from the intellectual property held in constructive trust, together with restitutionary relief, in amounts to be determined at trial;

e. In the alternative, rescissory damages in an amount to be determined at trial; and, in the further alternative, compensatory damages for fraud (measured by out-of-pocket loss or the benefit of the bargain) in an amount to be determined at trial;

f. On the common-law fraud claim, and against the individual Defendants who made or directed the misrepresentations, punitive damages in an amount to be determined at trial, in addition to and proportionate to the compensatory or rescissory damages awarded;

g. On Count III, judgment against Thomas, Platts, and Pearce, jointly and severally with Paragraf, for the relief awarded on Count I;

h. An award of the costs and expenses of this action, including reasonable attorneys' fees to the extent permitted by law;

i. Pre- and post-judgment interest as permitted by law; and

j. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 28, 2026

OF COUNSEL:

Brian C. Brook (*pro hac vice* application forthcoming)
BROOK & ASSOCIATES, PLLC
459 West 18th Street, Floor 9
New York, New York 10011
brian@brook-law.com

**KIRK & INGRAM, LLP**

/s/ *David E. Kirk*
David E. Kirk (No. 7310)
Y. Carson Zhou (No. 7288)
3411 Silverside Road, Suite 104B
Baynard Building
Wilmington, DE 19810
(302) 593-0650
dkirk@kirkingram.com
czhou@kirkingram.com

*Attorneys for Plaintiffs*